IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

LYLE WAYNE SHARP                                              PLAINTIFF

       v.                              CIVIL NO. 14-5048

CAROLYN W. COLVIN, Commissioner
Social Security Administration                               DEFENDANT


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

       Plaintiff, Lyle Wayne Sharp, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for a period of disability and disability insurance benefits ("DIB") under the provisions of Title II of the Social Security Act ("Act"). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. §405(g).

**I. Procedural Background**

       Plaintiff protectively filed his application for DIB on February 9, 2012, alleging an inability to work since November 1, 2006 due to post traumatic stress disorder ("PTSD") and osteoarthritis in his feet and knees. (Tr. 176). For DIB purposes, Plaintiff maintained insured status through June 30, 2009. (Tr. 13). His claim was initially denied on March 21, 2012, and denied upon reconsideration on April 23, 2012. (Tr. 13). An administrative hearing was held on November 30, 2012, at which Plaintiff appeared with counsel and testified. (Tr. 29-53). By a written decision dated February 8, 2013, the Administrative Law Judge ("ALJ") found that during the relevant time period

Plaintiff had the following severe impairments: hypertension; degenerative joint disease of the knees; depression; and PTSD. (Tr. 15). After reviewing all of the evidence presented, however, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 15). The ALJ found Plaintiff retained the residual functional capacity ("RFC") to "perform light work as defined in CFR 404.1567(a) except he was limited to work involving simple tasks with simple instructions and only incidental contact with the public." (Tr. 17). With the help of a vocational expert ("VE"), the ALJ determined Plaintiff could not perform his past relevant work ("PRW"), but that Plaintiff retained the capacity to perform the requirements of representative occupations such as small product assembler, bottling line attendant, and inspector/checker, and was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. (Tr. 23, Tr. 49-50). The ALJ then found that Plaintiff had not been under a disability as defined by the Act during the relevant time period. (Tr. 24).

Plaintiff next requested a review of the hearing decision by the Appeals Council, which denied that request on December 19, 2013. (Tr. 1-3). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Doc. 5; Doc. 10; Doc. 11).

**II. Evidence Presented**

At the time of the administrative hearing, Plaintiff was forty-eight years of age and had a high school education. (Tr. 22, 36). The record reflects Plaintiff's PRW consisted of employment as a forklift driver, utility worker, deck hand, and diesel engine technician. (Tr. 22, 48-49).

The medical evidence before the relevant time period reflects the following. Plaintiff had a history of alcoholism and depression as well as housing and legal trouble. (Tr. 987, 1004-1009, 1019-1020). In October 2005, Plaintiff was treated by the Department of Veterans Affairs ("VA") after his right tibia shaft was fractured. (Tr. 914). Plaintiff was prescribed hydrocodone, abused his medication, and was referred to a psychiatrist who diagnosed alcohol dependence, marijuana dependence, and major depression. (Tr. 715-717, 964, 1024-1025). Plaintiff entered an intensive outpatient therapy program, but relapsed after completing the program and was incarcerated. (Tr. 990, 1000, 1016, 1020-1024). After his release, Plaintiff reestablished treatment with the VA, and was diagnosed with depression, a flat foot condition, and arthritis in his knee. (Tr. 977-979). He was prescribed medications for depression, insomnia, pain, and hypertension (Tr. 947, 958-959, 964-966, 970), and participated in VA transitional housing programs where he appeared to achieve sobriety and full time employment. (Tr. 944, 949-952, 954).

The evidence from the relevant time period is the following. On November 9, 2006, Plaintiff spoke with VA Social Worker Diane Collins over the phone to update her on his sobriety and mental health progress. He stated he was attending Alcoholics Anonymous ("AA") meetings, working and saving money, was "happy with how things are going," and that he had no needs at the time. (Tr. 943).

On November 22, 2006, Plaintiff met with Dr. Ernest Emmerton, his primary care physician, to discuss the pain around his tibia fracture and his problems sleeping. (Tr. 937). Plaintiff was prescribed atenolol 25mg., capsaicin cream, Celexa 20mg., hydrocodone 5mg., salsalate 750 mg., Vicodin 500mg., and trazodone 100mg. (Tr. 937-938).

On December 14, 2006, Plaintiff attended a mental health session with Social Worker Brian Mcanally, who noted that Plaintiff was working full-time and receiving a lot of overtime while in the VA Grant and Per Diem Housing Program. (Tr. 936-937). Plaintiff was also compliant with attending all his counseling and AA sessions, and he was planning to attend college or re-embark on a career as a merchant seaman.

On December 21, 2006, Plaintiff visited the VA Orthopedic clinic for a one-year follow up of his right tibia fracture and met with Nurse Judy Petermann, who noted that Plaintiff had full motion of his knee with no swelling, although his knee was tender at the medial joint space. (Tr. 934-935). Plaintiff noted that he was "much improved," although he continued "to have knee pain but is able to do full activities as tolerated." (Tr. 934). An x-ray of Plaintiff's tibia showed that the tibia and fibula were in good alignment and healed. (Tr. 934). Nurse Petermann authorized his discharge from orthopedics. (Tr. 934). A separate exam the same day by Nurse Linda Thornbrough noted that Plaintiff was ambulatory and his pain had deceased/improved. (Tr. 935). Plaintiff rated his pain as a two out of ten, although Plaintiff noted that his main concern was his knees and that they had been bothering him a long time. (Tr. 934-936).

On January 1, 2007, Plaintiff met with Social Worker Mcanally to discuss his housing situation. (Tr. 933-934). It was noted during the visit that Plaintiff had completed his fourth month of the Grant and Per Diem housing program and was "on track to leave the program in April and return to his old job as a merchant seaman." (Tr. 934).

On January 26, 2007, Dr. Emmerton switched Plaintiff's prescription from Darvocet to more hydrocodone at Plaintiff's request that "hydrocodone works better for him." (Tr. 933).

On February 12, 2007, Plaintiff reported to the podiatry clinic and was seen by Nurse Linda Jones. Plaintiff complained of pain in the arches and the balls of his feet that had begun several months ago. (Tr. 923-932). He rated his pain as a six out of ten, which was an increase from December 21, 2006, when he rated his pain as a two. Plaintiff complained that his pain increased while lifting heavy objects and stated "I just lost my mobility, I have to pick up things sideways ... it is difficult to walk down stairs and it feels like my knees are going to give away." (Tr. 924, 929-930). Nurse Jones noted that Plaintiff claimed to be in pain while standing and walking from his toes to his ankles, but there was no objective evidence of painful motion, swelling, tenderness, instability, abnormal weight bearing, weakness,  hospitalization, surgery, or joint trauma. (926-930). Plaintiff was able to stand for up to one hour and walk between a quarter of a mile and a mile. (Tr. 930). Plaintiff reported that salsalate provided some relief for the pain in his feet and knees, and Nurse Jones noted that Plaintiff did not need an assistive aid for walking. (Tr. 929-930). Plaintiff was diagnosed as having a mild limitation on chores, shopping, recreation and traveling as well as moderate limitation on exercise and sports from his fallen arches. (Tr. 931). Plaintiff was also diagnosed with osteoarthritis in his knees, which prevented exercise and sports, severely impacted chores, and moderately impacted shopping and traveling. (Tr. 932).

On February 27, 2007, Plaintiff met with Social Worker Mcanally to discuss his progress after completing the six month VA Grant and Per Diem homeless program. (Tr. 922). Plaintiff stated that he was working full time, had paid down his debts, and had saved money (Tr. 922). Plaintiff also indicated that he hoped to be living independently by April 2007 by working as a merchant seaman. (Tr. 922).

On March 13, 2007, Plaintiff called Dr. Emmerton and requested his hydrocodone be increased because he was taking two pills during the day and one at night. (Tr. 938). The next day Dr. Emmerton increased his hydrocodone prescription to ninety pills a month. (Tr. 938).

On April 6, 2007, Plaintiff had a final meeting with Social Worker Mcanally, and was discharged from the VA Grant and Per Diem program. (Tr. 920). It was noted that Plaintiff was still working full time, had moved into an apartment in Joplin, Missouri, and that Plaintiff considered his depression to be under control. (Tr. 920).

On May 23, 2007, Plaintiff met with his new primary care physician, Dr. Jose Fontanilla, at the Fayetteville, Arkansas, VA and complained of chronic pain in his knee. Dr. Fontanilla noted that Plaintiff was diagnosed with mild osteoarthritis, PTSD, hypertension, and had a history of depression. (Tr. 914-916). Dr. Fontanilla's impression was that Plaintiff had hypertension, depression, PTSD, insomnia, gastroesophageal reflux disease with some dyspepsia, mild hepatitis, and osteoarthritis of his knee. Dr. Fontanilla continued Plaintiff's atenolol, trazodone, salicylate, and hydrocodone prescriptions, increased his Celexa prescription to 40mg., and prescribed omeprazole. (Tr. 916). Plaintiff was also given a substance abuse questionnaire where he denied drinking or using tobacco within the past year. (Tr. 918-919). The same day, Plaintiff also had a follow up with Social Worker Diane Erickson, and told her that the VA's homeless programs had helped him maintain his sobriety and obtain housing. (Tr. 913-914). Social Worker Erickson assessed that he was "functioning well in the community." (Tr. 914).

On June 25, 2007, Plaintiff met with Dr. Fontanilla and had an echogram of his abdomen that revealed he had diffuse fatty infiltration of the liver. (Tr. 860). Dr. Fontanilla noted that Celexa was

providing no relief, but increased Plaintiff's Celexa and Trazodone doses and indicated Plaintiff should have a check up in one year. (Tr. 862).

On July 14, 2007, Plaintiff was admitted to the VA medical ward for abdominal dyspepsia, vomiting, and chest pain. (Tr. 709-711, 728-729). Dr. Keith Hackler noted that Plaintiff had a history of hepatitis and possible Epstein-Barr virus exposure and diagnosed Plaintiff with hypokalemia and dehydration. (Tr.872-874). Plaintiff stated he had quit drinking alcohol but still occasionally used marijuana. (Tr. 873, 889-890). Plaintiff underwent a treadmill stress test, an electrocardiogram, and a chest x-ray, which were all negative, but Plaintiff had elevated liver function tests, possibly secondary to alcohol. Plaintiff was encouraged to eliminate alcohol intake and was told to discontinue ibuprofen or other NSAIDS. (Tr. 878-882).

Plaintiff next saw Dr. Fontanilla again on June 30, 2008, where it was noted that he was experiencing insomnia and PTSD, but that he had missed a recent mental health clinic appointment and was not taking his Celexa. (859-860).

On July 8, 2008, Plaintiff met with Social Worker Michael Johnson for his first mental health consult in two years. (Tr. 852-857). Plaintiff was given a suicide and depression screening and scored a 32 on the depression screening, which indicated severe depression. (Tr. 854-858). Two days later, Plaintiff visited with Janice Smith, PA-C, in the Mental Health Clinic. Plaintiff's GAF was assessed as 50 and it was noted that he had been referred for medication management by Social Worker Johnson due to depression and anxiety. (Tr. 851-852). Plaintiff's prescription of Celexa 60mg. and trazodone 100mg. were continued, and he was prescribed buspirone for anxiety and prazosin for nightmares. (Tr. 852-853).

On July 17, 2008, Plaintiff had a mental health follow up visit with Social Worker Johnson.

-7-

(Tr. 849-850). Plaintiff complained of bad dreams, irritability, anger, and feelings of guilt, fatigue, and lack of motivation. (Tr. 849). Plaintiff also reported being easily startled and having difficulty sleeping. (Tr. 849). Plaintiff said that he was working part-time on his uncle's farm and was a full time student at a technical school in Springdale, Arkansas, where he was studying ammonia refrigeration. (Tr. 849). Social Worker Johnson noted Plaintiff's behavior, memory, and appearance were appropriate, but noticed that Plaintiff had a depressed and anxious mood and assessed Plaintiff's GAF score as 50. (Tr. 849-850).

On August 5, 2008, Plaintiff had a mental health follow up with Ms. Smith to review his medication. (Tr. 843-845). Plaintiff stated that his nighttime medication was working but that his anxiety medication, Celexa, and buspirone were not helping and requested Xanax. (Tr. 843-845). Plaintiff's GAF was evaluated as 50 and his prescriptions for Celexa, trazodone, and prazosin were continued, but his buspirone prescription was dropped. (Tr. 844).

On August 6, 2008, Plaintiff met with Social Worker Johnson, who noted that Plaintiff was interested in entering a PTSD treatment program, and that Plaintiff's cognition and appearance were normal. (Tr. 845). He assessed Plaintiff's GAF as 50, but noted that Plaintiff reported vague and periodic suicidal intent and his mood appeared depressed and anxious. (Tr. 845). Plaintiff was given a pain screening. He reported no acute pain, but complained of chronic pain and estimated that his pain score was a five out of ten. (Tr. 846).

On August 21, 2008, Plaintiff saw Dr. Fontanilla who noted there was "nothing new" with Plaintiff's medical conditions, but prescribed clonazepam due to Plaintiff's complaints of anxiety. (Tr.838-841). The same day, Plaintiff met with Social Worker Johnson for a mental health check up to discuss his diagnosis of PTSD and chronic depression. (Tr. 841-842).

On August 27, 2008, Plaintiff again met with Social Worker Johnson for a mental health check up to discuss his diagnosis of PTSD and chronic depression. (Tr. 836). Mr. Johnson estimated Plaintiff' GAF as 50, and wrote that Plaintiff was attempting to enter the Biloxi, Mississippi,  VA PTSD program. (Tr. 836).

On September 5, 2008, Plaintiff was seen by Ms. Smith for a mental health follow up. He reported that his mood was "better, not so anxious" and that "his anxiety is much improved since starting the clonazepam" along with Celexa. (Tr. 834-835). It was noted that Plaintiff's cognitive function and appearance were normal although Plaintiff had a "mild anxious affect." (Tr. 835).

A gap appears in Plaintiff's medical history beginning in September 2008 apparently because Plaintiff was incarcerated for a DWI and aggravated assault from October 2008 to August 2009. (Tr. 45, 831). At the time, Plaintiff was seeking admission into a VA PTSD program. (Tr. 306-307, 831-833).  Plaintiff's date last insured occurred on June 30, 2009, while he was incarcerated.

The medical evidence after the relevant time period shows that Plaintiff reestablished treatment after serving a term of incarceration. Plaintiff was admitted into an eight week VA residential PTSD program from December 2009 to February 2010 (Tr. 310, 494, 530), and then entered a twenty-four week VA residential rehabilitation treatment program ("RRTP") from February 2010 to June 2010 for substance abuse treatment and vocational training. (Tr. 260-261, 492-493). During RRTP, Plaintiff completed a fitness program of forty-five minute exercise sessions three times per week, and was assigned to the laundry work team where he completed 35-40 hour work weeks with superb attendance. (Tr. 329-330, 347, 387, 509-513). Plaintiff's weekend recreational activity logs showed that he also enjoyed a healthy and active social life. (Tr. 315-316, 318, 323, 327, 331, 337, 344, 363, 374, 400, 422).

-9-

After completing the RRTP program, the VA increased his PTSD rating from 30-percent disabling to 70-percent disabling, effective July 28, 2008. (Tr. 242-243). Plaintiff continued his mental health treatment with a new psychiatrist, Dr. Thomas Newberry (Tr. 791-793), but was incarcerated between late 2010 and August 2011, which stopped his mental health treatment. (Tr. 773-774, 761). After his release, Plaintiff reestablished treatment with Dr. Newberry, but his mental health appeared to have deteriorated and his GAF was consistently a 45 or a 45-50. (Tr. 711, 770-774 761, 764-765).

Plaintiff submitted a Function Report on October 26, 2010. (Tr. 151-160). He described watching television and reading as his daily activities and indicated his major limitations were socializing with other people and sleeping without nightmares. (Tr. 153-154). He also stated he had no problems with remembering things, paying bills, or completing personal care; managed one to two hours of basic chores like cleaning and laundry; and that he did not have any problems using his hands or reaching. (Tr. 154-156). Plaintiff indicated, however, that he had problems concentrating, following directions, or being in crowds, and also indicated he could only walk about 100 feet and had been using a cane since 2010. (Tr. 158-159). On April 2, 2012, Plaintiff submitted an updated Function Report that was consistent with his original Function Report, but indicated more extensive problems with concentration and memory. (Tr. 205-212).

Plaintiff's mother submitted a third party Function Report stating that Plaintiff had nightmares, was a recluse, had problems paying attention, and suffered from having little patience and a short temper. On the positive side, she stated that Plaintiff did not have memory problems, followed instructions well, was good at getting along with authority figures, went outside once a day, and shopped a few times a week. (Tr. 161-169).

An assessment of Plaintiff's physical RFC during the relevant time period was completed by the State's non-examining, consulting physician Dr. Ramona Bates on March 15, 2012. (Tr. 1039-1045). Dr. Bates opined that Plaintiff could carry at least ten pounds frequently, sit about six hours in an eight hour workday, and had no push/pull, postural, manipulative, visual, communicative, or environmental limitations. Dr. Bates further opined that Plaintiff's alleged limitations were not supported by exams in the medical record and that Plaintiff had an RFC of light work. (Tr. 1045). Dr. Bates's opinions were affirmed by Dr. Jerry Thomas on April 12, 2012. (Tr. 1072). An assessment of Plaintiff's mental RFC during the relevant time period was completed by the State's non-examining, consulting physician, Dr. Diane Kogut, on March 21, 2012, who opined that there was insufficient evidence to rate Plaintiff's claim because only limited information existed during the relevant period, which was affirmed by Dr. Sheri Simon on April 12, 2012. (Tr. 1050 - 1062).

Plaintiff also submitted a Medical Source Statement completed by Dr. Thomas Newberry, the psychiatrist who began treating Plaintiff in 2012, to the Appeals Council on April 9, 2013. (Tr. 1084-1090). It is noteworthy that Dr. Newberry's opinions were based on Plaintiff's condition after the relevant time period. Dr. Newberry opined that Plaintiff had several significant impairments in his ability to understand, remember, and follow directions; make decisions; work in coordination or proximity with others or the general public; set realistic goals; respond appropriately to changes in a workplace; complete a normal workday without interruptions or psychological symptom; and that his GAF was 45-50. (Tr. 1085-1086, 1089). Dr. Newberry also opined that Plaintiff's behavioral condition made him much more vigilant and caused him to misperceive his experience of pain or other physical symptoms (Tr. 1086); that Plaintiff would be absent for five days or more each month; that Plaintiff would be unable to complete a workday five days or more a month; that Plaintiff could

only be expected to perform a forty hour work week; and that Plaintiff would be unable to work or would be off task for 30-percent of each workday. (Tr. 1086-1089). Finally, Dr. Newberry opined that Plaintiff was unable to obtain and could not retain work in a competitive work setting. (Tr. 1089).

### III. Applicable Law.

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F.3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.3d 964, 966 (8th Cir. 2003). As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at lease one year and that prevents him from engaging in substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or

psychological abnormalities which are demonstrated by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382(3)(c). A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. See 20 C.F.R. § 404.1520. Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his RFC.

## IV. Discussion

Plaintiff raises the following issues on appeal: The ALJ (1) failed to develop the record, (2) erred in assessing Plaintiff's credibility, and (3) erred in the RFC determination. (Pl. Br. 9-15).

### A. Duty to Fully Develop the Record:

Plaintiff contends that the ALJ failed to develop the facts fully and fairly because the ALJ should have sought further clarification about Plaintiff's "hand tremor problems" and "the nature and extent of Plaintiff's depression." (Pl. Br. 9).

The ALJ has a duty to develop the record fairly and fully, independent of the claimant's burden to press his case, Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), and must develop a reasonably complete record. See Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). An ALJ's duty may include re-contacting a treating physician to clarify an opinion, but only if a crucial issue

is undeveloped, the available evidence does not provide an adequate basis for determining the merits of a claim, or the ALJ cannot ascertain the basis of a medical opinion from the case record. Ellis, 392 F.3d at 994; see also Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004); Social Security Ruling 96-5p. The regulations do not require the Secretary or the ALJ to order a consultative evaluation of every alleged impairment, but an ALJ may do so if the existing medical sources do not contain sufficient evidence to make a determination. Matthews v. Bowen, 879 F.2d 423, 424 (8th Cir. 1989). "There is no bright line rule indicating when the Commissioner has or has not adequately developed the record; rather, such an assessment is made on a case-by-case basis." Battles v. Shalala, 36 F.3d 43, 45 (8th Cir. 1994).

Here, the ALJ was presented with sufficient medical records to determine the merits of Plaintiff's claim. The ALJ reviewed dozens of mental health evaluations from Plaintiff's treating psychiatrists, social workers, and substance abuse counselors. The medical notes indicated that Plaintiff suffered from some degree of anxiety and depression, which the ALJ accounted for in the RFC determination. The ALJ was able to discount Plaintiff's subjective complaints because of the frequent examinations he underwent while participating in the VA's homeless, vocational, and substance abuse programs.

The undersigned has closely reviewed the record of more than a thousand pages and also cannot find any medical reference to Plaintiff's alleged hand tremors. Plaintiff did not list any impairments with his hands in his Function Reports (Tr. 154-156, 205-212). The only references to hand tremors in the medical documents are notes that Plaintiff did not have hand tremors. (Tr. 303, 493, 673). If there were any medical records indicating  hand tremors, Plaintiff had a burden to submit documentation in support of his claim.

-14-

Where there are large gaps in Plaintiff's treatment records, it appears they are because of Plaintiff's failure to seek treatment, often due to his incarceration. There are no records to indicate treatment he received while incarcerated, and benefits are not payable to any "individual for any month ending with or during or beginning with or during a period of more than 30 days throughout all of which such individual is confined in a jail, prison, or other penal institution or correctional facility pursuant to his conviction of a criminal offense." U.S.C. §402 (x)(1)(A)(I) (1993).

The records provided the ALJ with sufficient evidence to evaluate Plaintiff's physical impairments. Given the evidence detailed in the ALJ's written decision and the Court's deference to the ALJ when deciding if the record is fully developed, the undersigned believes the ALJ met his basic duty to fully and fairly develop the record as a whole in determining Plaintiff's claim.

**B. Credibility Analysis:**

The undersigned next addresses the ALJ's assessment of Plaintiff's subjective complaints. The ALJ determined that "after careful consideration of the evidence, ... the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible for the reasons explained in the decision." (Tr. 19).The ALJ was required to consider all of the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions. See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where

-15-

inconsistencies appear in the record as a whole. Id. It is well-established that "credibility is primarily a matter for the ALJ to decide." Edwards, 314 F.3d at 966 (8th Cir. 2003). The ALJ is entitled to make a factual determination that a claimant's subjective complaints are not credible when contrary objective medical evidence exists. Ramirez, 292 F.3d at 581 (8th Cir. 2002).

Plaintiff contends that the ALJ did not perform a proper Polaski analysis because the ALJ did not provide "any solid substantiated reasons for discrediting Plaintiff's testimony" (Pl. Br. 12), and also "did not discuss the medication the Plaintiff took, nor the effectiveness of them or the side effects." (Pl. Br. 13).

After reviewing the administrative record, however, the undersigned finds that the ALJ performed a proper Polaski analysis. The ALJ's opinion referenced the Polaski factors and discussed the relevant evidence. The ALJ specifically mentioned Plaintiff's testimony and function reports and listed Plaintiff's daily activities. (Tr. 16). The ALJ also noted that Plaintiff claimed "he had pain in his knees and feet that began as soon as he put weight on them," and that he "could not be around crowds of people, without having panic attacks." (Tr. 17). Finally, the ALJ discussed Plaintiff's medications and wrote that Plaintiff claimed "to spend most of his time napping, because his medications made him drowsy," and that Plaintiff testified "his medications kept him mentally stable, but the side effects were physically limiting … he was unable to focus and was mentally/socially inept … and had problems getting along with people." (Tr. 17-18).

After discussing these Polaski factors, the ALJ identified several inconsistencies between the Plaintiff's subjective complaints and the evidence in the record. The ALJ noted that Plaintiff's Function Report was contradicted by his mother's Third Party Function Report (Tr. 18); that Plaintiff reported hydrocodone was effective at relieving his pain (Tr. 20); and that Plaintiff reported to

physicians on several occasions that his anxiety had improved and that he was sleeping better and having fewer nightmares. (Tr. 22). The ALJ also noted that Plaintiff missed scheduled appointments with the PTSD clinic in 2007 (Tr. 20), and rejected outpatient therapy for PTSD in 2008. (Tr. 21).

Plaintiff argues that the ALJ did not specifically discuss his medications or their effectiveness and side effects. The ALJ's written decision, however, has extensive references to Plaintiff's medications. In addition to the references already discussed,  the ALJ wrote, "[Plaintiff] stated he had side effects from medications including dizziness, drowsiness, and lightheadedness …" (Tr. 17) and Plaintiff "stated he takes six hydrocodone pills a day for his pain as well as medications for depression, nightmares, high blood pressure, and his heart." (Tr. 18). The ALJ discussed Plaintiff's prescription history as follows:

> [Plaintiff] indicated that he was first prescribed medication for his PTSD with symptoms of nightmares, chronic depression, and anxiety in 2006. [He] reported that his medication keeps him mentally stable but makes him very sleepy so he is not supposed to drive. (Tr. 18).

The ALJ also discussed Plaintiff's statements that his pain medication was effective and wrote, "[Plaintiff] indicated that he had chronic pain from arthritis but reported that hydrocodone was effective at relieving his pain." (Tr. 20).

Even if the ALJ did not discuss Plaintiff's medications, this normally would not amount to reversible error. The ALJ's decision did not need to include a discussion of how every Polaski factor related to the Plaintiff's credibility because the analytical framework was recognized and considered. Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004).

The ALJ's credibility determination was also consistent with other substantial evidence in the record. Plaintiff missed several initial appointments to be treated for PTSD in 2007, resulting in a two-year gap in mental health treatment between 2006 and 2008. (Tr. 45, 831). Plaintiff's failure

to seek treatment indicates that his condition was not as disabling as alleged.  (Tr. 852-853, 859-860); Shannon v. Chater, 54 F.3d 484, 487 (8th Cir. 1995); See also Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007). Plaintiff also expressed on several occasions that his medications controlled his anxiety, depression, and pain, which indicated that he was not disabled as alleged during the relevant time period. (292-295, 481, 913-914, 920, 929-930, 934, 936-937, 943-944); Brace v. Astrue, 578 F.3d 882, 885 (8th Cir. 2009). Plaintiff's testimony was also not completely consistent with the record. For instance, he testified that he had not "done any work at all" since November 1, 2006 (Tr. 38), but the record showed that he was employed during parts of 2006, 2007, and 2010, and worked on his uncle's farm in 2008. (Tr. 329-330, 347, 387, 509-513, 849-850, 920, 936-937).

The record shows that the ALJ properly considered the Polaski factors in reaching his credibility determination, and substantial evidence in the record supports the ALJ's credibility determination. The ALJ was in the best position to gauge the credibility of testimony, and his findings on Plaintiff's subjective complaints are granted deference. See Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).

Based upon the foregoing, the undersigned believes there is substantial evidence to support the ALJ's credibility findings.

**C. RFC Determination**:

The undersigned next turns to whether the ALJ erred in concluding that Plaintiff had an RFC of light work. RFC is the most a person can do despite that person's limitations, and is assessed using all relevant evidence in the record. 20 C.F.R. §404.1545(a)(1). This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations. Guilliams v. Barnhart, 393. F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584,

591 (8th Cir. 2004). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §404.1545(a)(3). A claimant's residual functional capacity is a medical question, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001), therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003). The ALJ is required to specifically set forth a claimant's limitations and to determine how those limitations affect his RFC. Lewis, 353 F.3d at 646.

Plaintiff contends the ALJ erred in assessing Plaintiff's RFC because the ALJ did not properly consider Plaintiff's GAF score of 45 from November 8, 2005, a date before the relevant time period. (Pl. Br. 14). Plaintiff's citation to this GAF score is inaccurate. (Pl. Br. 8). In fact, there does not appear to be any mental evaluation of Plaintiff on November 8, 2005, in the record. The mental health evaluation nearest this mystery date was when Plaintiff was evaluated by Dr. Michael Moravitz, a clinical psychologist, on January 13, 2006. During that visit, Dr. Moravitz assessed that Plaintiff had no cognitive impairments, scored Plaintiff's GAF as 50, and diagnosed Plaintiff with alcohol dependence, marijuana dependence, and major depression. (Tr. 1020-1021). While a comprehensive list of Plaintiff's GAF scores from January 2006 to March 2012 showed that Plaintiff's GAF score was assessed twenty-two times, a psychiatrist did not assess Plaintiff's GAF scores during the relevant time period. (Tr. 711).  After Dr. Moravitz's assessment, Plaintiff's next GAF scores were assessed by Dr. John Wade on June 14, 2006 and July 26, 2006. Dr. Wade assessed a GAF of 60 on both occasions. (Tr. 711, 958-959, 964-966). Plaintiff's GAF was also assessed as between a 60-65 by nurses on four other occasions in 2006, before the relevant time period for Plaintiff's disability claim. (Tr. 711). Plaintiff's GAF score was not evaluated again until 2008, when

Social Worker Michael Johnson assessed a GAF of 50 on three occasions in July and August, before Plaintiff was incarcerated. (Tr. 711).

While a GAF score alone is not determinative of disability, a GAF score is relevant. Pates-Fires v. Astrue, 564 F.3d 935, 944 (8th Cir. 2009). An ALJ is allowed, however, to give greater weight to medical evidence and testimony than to GAF scores when the evidence requires it. Jones v. Barnhart, 345 F.3d 661, 666 (8th Cir. 2003). GAF scores from an acceptable medical source did not exist during the relevant time period, and the ALJ's failure to assign weight to the GAF scores from a social worker does not amount to a reason for reversal. See Jones v. Astrue, 619 F.3d 963, 974 (8th Cir. 2010).

The undersigned's careful review of the record also shows there was substantial evidence to support an RFC of light work. Especially persuasive is the evidence that showed Plaintiff was employed during a significant portion of the relevant time period. (Tr. 329-330, 509-513, 849, 920, 922). Plaintiff's behavior also indicated that he did not consider himself disabled during the relevant time period. He repeatedly told medical providers and counselors that he did not have limitations that affected his ability to work full time. (Tr. 292-295, 913-914, 920, 934, 943). He also sought vocational training through the VA, and attended a technical school where he earned a certification in ammonia refrigeration. (Tr. 849, 922, 934, 936-937). An intention to return to work indicated that Plaintiff was not disabled. Naber v. Shalala, 22 F.3d 186, 188 (8th Cir. 1994). Plaintiff's documented activities were also consistent with an ability to work. Plaintiff's ability to enjoy long walks, fishing, bowling, and socializing indicated that he did not have debilitating pain and was not as reclusive as alleged, at least during the relevant time period. (Tr. 315-316, 318, 323, 331, 337, 355, 374, 400, 422, 434).

The undersigned concludes that substantial evidence supported the ALJ's RFC determination and that his determination was based on all relevant evidence in the record.

### D. Hypothetical Question to the Vocational Expert:

After thoroughly reviewing the hearing transcript, along with the entire evidence of record, the undersigned finds that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, the undersigned finds that the vocational expert's opinion constitutes substantial evidence supporting the ALJ's conclusion that Plaintiff retained the capacity to perform the requirements of representative occupations such as small product assembler, bottling line attendant, and inspector/checker, and was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Pickney v. Chater, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

### E. Conclusion:

Based on the foregoing, the undersigned recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice. **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Dated this 5th day of December 2014.

-21-

/s/ *Erin L. Setser*

HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE